Kixsports, LLC v. Munn, 2019 NCBC 61.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

KIXSPORTS, LLC,

          Plaintiff,

v.

RYAN MUNN; TYLER VAUGHAN; RENEGADE GK; BIG DREAMZ, LLC; AND MIRO GROUP, LLC,

          Defendants and
          Third-Party
          Plaintiffs,

v.

CASEY CARR; and STEPHEN PYE,

          Third-Party
          Defendants.

RYAN MUNN; and TYLER VAUGHAN, derivatively on behalf of KIXSPORTS, LLC,

          Derivative
          Plaintiffs,

v.

CASEY CARR; and STEPHEN PYE,

          Derivative
          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 16373

**ORDER AND OPINION ON DEFENDANTS' MOTION FOR ORDER TO SHOW CAUSE FOR CONTEMPT OF COURT AND FOR DISCOVERY SANCTIONS**

1. This Opinion aims to bring to a close a discovery dispute that began a year and a half ago. In early 2018, Kixsports, LLC and its principals, Casey Carr and Stephen Pye, were ordered to produce their electronic devices for inspection by a forensic expert and to bear the cost of the expert's fees if the inspection revealed relevant evidence or the intentional deletion of evidence. The inspection process

limped along while the parties haggled over how to review more than 100,000 documents retrieved by the forensic expert. Out of those negotiations (and with some prodding from the Court) came a partial production in February 2019. The five defendants—Ryan Munn, Tyler Vaughan, Renegade GK, Big Dreamz, LLC, and Miro Group, LLC ("Defendants")—now contend that the forensic expert retrieved highly relevant evidence and also detected intentional deletion of evidence by Carr and Pye. Defendants move to recover the forensic expert's fees and further argue that Kixsports, Carr, and Pye should be held in contempt and sanctioned for discovery abuses. (ECF No. 138.) Having considered all relevant matters, the Court **GRANTS** in part and **DENIES** in part the motion.

> *Nelson Mullins Riley & Scarborough LLP, by Ariel E. Harris, Evan M. Sauda, and Fred M. Wood, Jr., for Plaintiff Kixsports, LLC and Third-Party Defendants Casey Carr and Stephen Pye.*

> *Parker Poe Adams & Bernstein, LLP, by A. Todd Sprinkle and Eric A. Frick, for Defendants/Third-Party Plaintiffs Ryan Munn, Tyler Vaughan, Renegade GK, Big Dreamz, LLC, and Miro Group, LLC.*

Conrad, Judge.

I.
BACKGROUND

2. This case started as an action by Kixsports against two of its former members, Vaughan and Munn. Kixsports, now dissolved, was in the business of making and selling soccer gear and related products. It alleges that Vaughan and Munn secretly developed a new goalie glove and then began selling it through a competing business, giving rise to claims for breach of fiduciary duty, breach of contract, misappropriation of trade secrets, and others. Twice amended, the

complaint also includes related claims against Vaughan and Munn's new businesses, Big Dreamz and Miro Group.

3. These allegations prompted an energetic response from Vaughan and Munn. Along with a handful of contract-related counterclaims against Kixsports, Vaughan and Munn assert nearly a dozen third-party and derivative claims against Carr and Pye, the two managing members of Kixsports. Among other things, it is alleged that Carr and Pye looted Kixsports and put the company at risk through false tax reporting based on inaccurate valuations. Munn also alleges that Carr and Pye fraudulently induced him to invest in Kixsports by misrepresenting or concealing aspects of its financial and business affairs.

4. Discovery proved to be contentious. In March 2018, Defendants moved to compel complete responses to their discovery requests. (ECF No. 32.) Most relevant here is Defendants' request for production number 4, which sought copies of communications related to the subject matter of the case. Defendants asserted that Kixsports had produced "limited emails involving Ryan Munn in late 2016" but no other communications. (ECF No. 32.)

5. Kixsports, Carr, and Pye opposed the motion to compel on the ground that there were no other responsive documents to produce. In an affidavit, Pye testified that

> I generally am not very proficient with technology, and do not send many emails or text messages. I know that I have exchanged some text messages regarding this litigation with Ryan Munn and Casey Carr. Every text message I am able to locate on my cell phone has been produced, as well as any emails I have located that are responsive to the discovery requests.

(Pye Aff. ¶ 11, ECF No. 91.) He went on to state that "it would be impossible for me to comply with" an order compelling production of additional communications because "I have turned over any emails, text messages and other written communications I have been able to locate . . . ." (Pye Aff. ¶ 17.) Carr testified that he, too, had produced every responsive text message and e-mail he had been able to locate and that it would therefore be impossible to comply with an order compelling further production. (*See* Carr Aff. ¶¶ 10, 16, ECF No. 92.) These sworn statements have never been modified or retracted.

6. In an order dated April 25, 2018, the Honorable Hugh B. Lewis granted Defendants' motion to compel. Judge Lewis reasoned that it was "extremely difficult to believe that Mr. Pye and Mr. Carr would operate a business valued between $1 million and $2.5 million without communicating with each other." (ECF No. 40 at 2 ["April 2018 Order"].) He ordered a forensic examination of the electronic devices of Kixsports, Carr, and Pye to identify any communications between Carr and Pye (and third-parties) "related to the subject matter of this proceeding and responsive to Request for Production No. 4." (April 2018 Order at 2–3.) Allocation of the forensic expert's fees would depend on what the inspection revealed:

> [i]f no communications between Casey Carr and Stephen Pye, or between Casey Carr and/or Stephen Pye and third parties, related to the subject matter of this proceeding are found, Defendants will bear the cost of the forensic expert fees. However if communications between Casey Carr and Stephen Pye are discovered, or there is evidence of intentional deletion of such communications when Casey Carr or Stephen Pye were aware of circumstances that were likely to give rise to future litigation, consistent with North Carolina principles on destruction of evidence, Kixsports, LLC, Casey Carr, and Stephen Pye shall bear the cost of the forensic expert fees.

(April 2018 Order at 3.)

7. In short order, Defendants retained Clark Walton of Reliance Forensics, LLC ("Reliance") as a forensic expert. The parties then stipulated to a Confidentiality Agreement and Protective Order, along with a separate Computer Protocol, to govern the inspection. (*See* Protective Order, ECF No. 42; Protective Order Ex. A, ECF No. 42 ["Computer Protocol"].) Reliance was tasked with creating images of the relevant devices in a searchable format, using a set of search terms provided by counsel to identify potentially responsive documents, and performing a second search to screen the documents for potentially privileged material to be reviewed by counsel for Kixsports, Carr, and Pye. (Computer Protocol ¶¶ 1, 6, 7.) Reliance was also authorized to retrieve content associated with various software applications, such as WhatsApp, Slack, Gmail, and similar applications. (Computer Protocol ¶ 5.) The parties seem to have contemplated at the time that Reliance would review the results of the search for relevance and produce any relevant, non-privileged documents to counsel for both sides. (Computer Protocol ¶¶ 8, 12.)

8. Cooperation soon gave way to conflict. In June 2018, Defendants moved for sanctions, citing essentially three grounds. (ECF No. 44.) The first was that counsel at the time for Kixsports, Carr, and Pye had repeatedly refused Walton's requests for login credentials for some of the software applications. (*See* Reply Br. Ex. 1, ECF No. 144.1; 1st Walton Aff. ¶¶ 18–22, 25, ECF No. 45.) Second, Kixsports's counsel had received from Reliance a set of potentially privileged documents but failed to provide a privilege log to Defendants' counsel. (ECF No. 44 at 4–5.) And third, Defendants

submitted an affidavit from Walton opining that Carr and Pye had deleted relevant evidence. (1st Walton Aff. ¶ 6.)

9. This motion never received a hearing. While it was pending, Kixsports, Carr, and Pye retained new counsel, and the parties jointly moved to designate the case as exceptional under Rules 2.1 and 2.2 of the General Rules of Practice for the Superior and District Courts of North Carolina. (ECF Nos. 1, 96.) After designation and assignment in August 2018, this Court entered an order directing that the General Rules of Practice and Procedure for the North Carolina Business Court would apply going forward. (ECF No. 2.) The Court also entered a case management order, which adopted the parties' proposed schedule for completing fact discovery by March 15, 2019. (ECF No. 98; *see also* ECF No. 122.) Around the same time, Defendants withdrew their sanctions motion, stating that "they ha[d] not received the full results of the forensic examination being conducted by" Reliance and reserving their right to refile it later. (ECF No. 97.)

10. Once the sanctions motion was withdrawn, the parties worked out some of the initial issues, including access to necessary login credentials. Reliance completed the imaging process and identified over 100,000 potentially relevant documents using the search terms provided by counsel. Although the Computer Protocol stated that Reliance should go on to review these search hits for relevance, Reliance reported that it was not capable of doing so. (*See* Opp'n Defs.' Mot. Extension Ex. A, ECF No. 134.1.) That led to a new dispute. In short, both sides agreed that someone must

review the documents for relevance, but neither side wished to bear the expense of reviewing such a huge volume of material.

11. Defendants brought the dispute to the Court's attention through a pre-motion submission under Business Court Rule 10.9. At a hearing on January 17, 2019, the Court urged the parties to identify the documents most likely to be relevant and to negotiate terms for reviewing that smaller, more manageable subset. The Court also directed the parties to provide weekly status updates. Over the following weeks, the parties reported that a first set of documents was produced on February 27, with two additional productions being made in the week following the March 15 close of discovery. When Kixsports, Carr, and Pye refused to produce additional documents, Defendants moved to reopen the period for fact discovery. (ECF No. 130.) The Court denied that motion as untimely. (ECF No. 135.)

12. In June 2019, Defendants renewed their request for discovery sanctions and for an order holding Kixsports, Carr, and Pye in contempt. (ECF No. 138.) They contend that Reliance's forensic inspection revealed hundreds of relevant documents and evidence that Carr and Pye deleted relevant communications, all of which supports their recovery of the forensic expert fees under Judge Lewis's order along with additional sanctions. Kixsports, Carr, and Pye respond that they have complied with the order and that the forensic inspection turned up nothing of importance. The motion has been fully briefed, and the Court held a hearing on August 7, 2019, at which all parties were represented by counsel. The motion is ripe for determination.

## II.
## ANALYSIS

13.  There are, in general, two related issues here. One is whether Kixsports, Carr, and Pye should bear the cost of Reliance's expert fees. That issue is controlled by Judge Lewis's order. The second issue is whether the discovery conduct of Kixsports, Carr, and Pye as a whole—including conduct related to the forensic examination—merits sanctions under Rule 37 of the North Carolina Rules of Civil Procedure and this Court's inherent authority.

### A. Forensic Expert Fees

14.  This Court is not free to revisit Judge Lewis's ruling (and no party has asked it to do so). It bears noting, though, that his order finds support in governing rules and case law. Certainly, courts approach forensic imaging with a measure of caution because of its intrusive nature. But "[f]orensic examinations . . . may be warranted when there exists some factual basis to conclude that the responding party has not met its duties in the production of discoverable information." *Crosmun v. Trs. of Fayetteville Tech. Cmty. Coll.*, 2019 N.C. App. LEXIS 658, at \*21–22 (N.C. Ct. App. Aug. 6, 2019).

15.  That is exactly what Judge Lewis concluded here. When Defendants moved to obtain communications relevant to the disputed issues, Carr and Pye testified that they rarely communicated with each other through electronic means and therefore had none to produce. (*See* Carr Aff. ¶¶ 10, 11, 16; Pye Aff. ¶¶ 11, 12, 17.) Judge Lewis found it "extremely difficult to believe" that the principals of an internet-based business possibly valued at $2.5 million had not used modern technology to

communicate with each other.  (April 2018 Order at 2.)  On that basis, he ordered a forensic analysis of Kixsports, Carr, and Pye's electronic devices, with the caveat that Defendants would pay the forensic expert's fees if what Carr and Pye said turned out to be true.  On the other hand, if the expert found relevant communications between Carr and Pye or "evidence of intentional deletion of such communications" at a time when litigation was likely, then the expert's fees would be borne by Kixsports, Carr, and Pye.  (April 2018 Order at 3.)

16.    Defendants contend that Judge Lewis's skepticism has been validated.  They claim to have found 535 relevant documents through the forensic examination, more than 50 of which are attached as exhibits to their motion.  (*See* Br. in Supp. 10, ECF No. 141; *see also* Sprinkle Aff. Exs. 5–63, ECF Nos. 139.5–139.63.)  They also claim to have found evidence that Carr and Pye intentionally deleted relevant communications, relying on several affidavits from Walton, the forensic expert, in support.  (*See* Br. in Supp. 5–8.)  Either ground, Defendants contend, supports the reimbursement of more than $50,000 in forensic expert fees under Judge Lewis's order.

17.    Kixsports, Carr, and Pye deny this.  In their opposition brief, they argue that the disputed documents "are a far cry from relevant."  (Opp'n 11, ECF No. 142; *see also* Opp'n 7, 12, 16, 20–21.)  At the hearing, though, their counsel retreated from that position and conceded that some of the documents were minimally relevant, though not significant or important.  Kixsports, Carr, and Pye also argue that

Reliance did not find evidence of *intentional* deletion of communications. (*See* Opp'n 6, 20.)

1. Relevance of Retrieved Communications

18. After careful review, the Court concludes that many of the communications recovered through the forensic examination are plainly relevant. Among the documents are drafts of business plans, strategic plans, and financial projections for Kixsports from the relevant time period. (*See* Sprinkle Aff. Exs. 21, 30, 32, 36, 37, 40.) At a minimum, these documents are relevant to Munn's claims for fraud and the representations that Carr and Pye either did or did not make in soliciting Munn's investment. By way of example, Munn alleges that Carr and Pye falsely represented that Kixsports owns a patent covering a soccer ball known as KixFriction when, in fact, Pye personally owns the patent. Some of the disputed documents tend to support Munn's allegation: Kixsports refers to "our Kixfriction patented soccer ball," "[o]ur unique proprietary KixFriction ball," and "design and utility patents" held by the company. (Sprinkle Aff. Exs. 21, 32, 36.)

19. There are also documents reflecting the investments made in Kixsports and the value assigned by the company to each investor's shares. (*See* Sprinkle Aff. Exs. 9, 19, 23, 27, 28, 38, 41, 42, 43.) Other communications between Carr and Pye appear to discuss their motivations for seeking investors in Kixsports and their plans to use funds given by others for their own personal expenses. (*See* Sprinkle Aff. Exs. 5, 7, 11, 12, 13, 14.) These documents are relevant to the fraud claims, the claims alleging inaccurate valuations of Kixsports, or both.

20. Kixsports, Carr, and Pye contend that cost-shifting is not required because these are not "important documents" and because other evidence, such as Munn's deposition testimony, weighs against Defendants' claims. (Opp'n 10, 13–15.) But Judge Lewis's order is clear: Kixsports, Carr, and Pye must pay the forensic expert's fees if the forensic examination revealed communications "related to the subject matter of this proceeding." (April 2018 Order at 3.) Through the forensic examination, Defendants have identified a substantial number of relevant communications. That Kixsports, Carr, and Pye have responses or defenses to those documents is beside the point. The condition in Judge Lewis's order has been satisfied. Thus, Kixsports, Carr, and Pye must bear the cost of Reliance's fees.

2. Intentional Deletion of Evidence

21. Next, the Court considers evidence that Carr and Pye intentionally deleted relevant communications. Judge Lewis's order refers to "North Carolina principles on destruction of evidence"—also known as spoliation—as the appropriate standard. (April 2018 Order at 3.) Thus, Defendants must show that Kixsports, Carr, and Pye "(1) intentionally destroyed or failed to preserve (2) potentially relevant materials (3) while aware of the possibility of future litigation." *SCR-Tech LLC v. Evonik Energy Servs. LLC*, 2014 NCBC LEXIS 72, at \*14 (N.C. Super. Ct. Dec. 31, 2014) (citation omitted).

22. First, the evidence shows that Carr's Mac computer contains folders associated with the process of backing up a mobile device through Apple's iTunes software. (2d Walton Aff. ¶ 17, ECF No. 140.) Walton testified that the folders were

first created in 2014 and would exist only if Carr had in fact backed up a mobile device. (2d Walton Aff. ¶ 18.) Yet the folders were empty, containing no backup files. (2d Walton Aff. ¶ 19.) As explained by Walton, the process for deleting a backup file takes several steps, and "[t]he likelihood that someone unintentionally deleted such an iTunes backup in this context is extremely slim." (2d Walton Aff. ¶ 21 (emphasis omitted).) In addition, the folder that should have contained the backup file was last modified on October 5, 2017—nearly a month after Kixsports filed its complaint. (2d Walton Aff. ¶ 19.)

23. All of this testimony is unrebutted. The opposition brief does not address it. Carr did not submit an affidavit denying or explaining the deletion. And Kixsports, Carr, and Pye did not retain an expert of their own to rebut or comment upon Walton's analysis. The Court concludes that it is more likely than not that Carr intentionally deleted backup files for his mobile device during the pendency of this lawsuit.

24. Second, it is clear that Carr and Pye frequently sent and received text messages, yet scores of these messages are missing. Munn provided to Reliance copies of nearly 300 text messages that he exchanged with Carr and Pye during the relevant time period, roughly between 2014 and 2017. None of these messages appears on the devices that Carr and Pye gave to Reliance. (2d Walton Aff. ¶¶ 11, 15.) Indeed, their three smartphones contained no text messages at all from before May 22, 2017. (*See* 2d Walton Aff. ¶ 15; 3d Walton Aff. ¶¶ 15, 21, ECF No. 145.) Of the messages retrieved from Carr's smartphone, some were exchanged with Pye after that date. (*See* 2d Walton Aff. ¶ 9.) Pye's two smartphones, on the other hand, did

not contain any of these messages even though there were more than 23,000 other text messages from 2017. (2d Walton Aff. ¶¶ 8, 10, 24.) Walton concludes that this shows intentional deletion. (2d Walton Aff. ¶ 12.)

25. Kixsports, Carr, and Pye respond that Walton failed to consider alternatives to intentional deletion, such as software settings that automate deletion of text messages. (Opp'n 6; *see* Opp'n Exs. D–F, ECF Nos. 143.4–143.6.) This is not persuasive. Kixsports, Carr, and Pye offer no expert testimony to support their position, and Walton submitted a supplemental affidavit showing that any deletions, whether automated or manual, were far more likely to be intentional than inadvertent. For one thing, the default setting for these devices is to retain text messages forever. Automated deletion requires action by the user to alter the setting. (3d Walton Aff. ¶ 13.) In addition, automated deletion works by scheduling the deletion of *all* text messages over a certain age (one year, for example), not by selecting and deleting messages with a specific user. (3d Walton Aff. ¶ 19.a.)

26. The evidence here is consistent with intentional deletion. Pye's smartphones contained thousands of messages from 2017 but none exchanged with Carr, even though it is undisputed that such messages once existed. This cannot be explained by a theory of automated deletion; it is strong evidence of *selective* deletion of messages between Pye and Carr. Likewise, Pye and Carr altered their smartphones' default settings so that they would delete text messages more than one year old. (*See* 3d Walton Aff. ¶¶ 15, 19.b.) These were intentional acts, resulting in

the deletion of an unknown number of text messages sent and received before May 22, 2017.

27. Walton notes that the relevant devices do not record and store the exact dates of these deletions. (3d Walton Aff. ¶ 17; *see also* 3d Walton Aff. ¶ 19.b.) Thus, it is possible that Carr or Pye changed the default settings before litigation began. Even so, that would not excuse their failure to preserve evidence after litigation became likely. *See Tumlin v. Tuggle Duggins P.A.,* 2018 NCBC LEXIS 51, at *33 (N.C. Super. Ct. May 22, 2018) ("The obligation to preserve evidence begins when 'a party is aware of circumstances that are likely to give rise to future litigation.'" (quoting *McLain v. Taco Bell Corp.*, 137 N.C. App. 179, 187, 527 S.E.2d 712, 718 (2000))). Carr and Pye either caused or allowed their smartphones to delete messages after the complaint was filed (in September 2017), after Defendants requested the communications (in November 2017), after Defendants filed their motion to compel (in March 2018), and even after Judge Lewis issued his ruling (in April 2018). As to Pye, the evidence is even more clear: a comparison with Carr's device shows that Pye deleted messages that were exchanged with Carr while the litigation was pending, even as late as February 2018 when the discovery dispute was coming to the fore. (*See* 2d Walton Aff. ¶ 12.)

28. Kixsports, Carr, and Pye's other arguments are equally unpersuasive. They argue that Walton's opinions are outdated because his initial affidavit was signed in May 2018 but "not updated" to take into account new facts after that date. (Opp'n 5–6.) This is simply wrong. Walton expanded and reaffirmed his original conclusions

based on the complete forensic examination. (*See* 2d Walton Aff. ¶ 6; 3d Walton Aff. ¶ 7.) All of Walton's affidavits reach the same conclusion: Carr and Pye intentionally deleted potentially relevant information.

29. Kixsports, Carr, and Pye also argue that "[t]he data complained of by Defendants is not lost" because messages deleted from Pye's devices were retrieved from Carr's. (Opp'n 6.) It is highly doubtful that Pye's intentional deletion of text messages should be excused on the ground that Defendants found some of those messages elsewhere. *See, e.g.*, *Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 565 (N.D. Cal. 2008) ("[H]aving established with certainty that numerous emails were not produced from Ellison's email files—because the emails *were* produced from other files or accounts—it is impossible to know whether additional unproduced emails were also deleted or not turned over."). Regardless, the relevant messages from Carr's device were confined to a few months in 2017. The forensic examination revealed only one text message between Carr and Pye from November 2015 through April 2017, a key time period for purposes of this case. (*See* 2d Walton Aff. ¶¶ 25, 26.) Given their typical communication patterns, it is likely that Carr and Pye exchanged hundreds of messages during that timeframe. Obviously, this data was lost.

30. The Court therefore concludes that it is more likely than not that Carr and Pye intentionally deleted or failed to preserve communications related to the subject matter of this case. For this independent reason, Carr and Pye must bear the cost of Reliance's expert fees under the terms of Judge Lewis's order.

3. Amount of Fees

31.     The amount of recoverable fees is also disputed. Along with their motion, Defendants submitted invoices from Reliance totaling approximately $60,000. (*See* 2d Walton Aff. Ex. C, ECF No. 140.3; 3d Walton Aff. Ex. A, ECF No. 145.1.) Kixsports, Carr, and Pye object that Reliance's fees are disproportionately high given the number of relevant documents recovered and given certain actions by Defendants that drove up the cost of the inspection. (*See* Opp'n 17–18, 20–21.)

32.     Viewed in light of what the inspection revealed, the expert fees are not unreasonably high. Put simply, the inspection hit pay dirt. Defendants identified a substantial number of relevant communications even though they received and reviewed only a fraction of the 100,000 documents retrieved by Reliance. Beyond that, the inspection showed that Carr and Pye intentionally deleted or failed to preserve other electronically stored information. It is impossible to know how many communications were lost or what their import would have been, and Defendants almost certainly would not have discovered these improper actions in the absence of a forensic inspection. Reliance's fees are not excessive when compared with the results achieved by its inspection.

33.     Nor are the fees excessive due to Defendants' actions. Kixsports, Carr, and Pye point to the parties' early agreement to have Reliance review search hits for relevance, which Reliance later reported that it was not equipped to do. (*See* Opp'n 17–18.) The opposition brief goes on to state without citation that "[a]ny expenses associated with this mistake are the sole fault of Defendants," who had hired

Reliance. (Opp'n 18.) The Court is left to guess at what those expenses might be. In the absence of further explanation, it seems more likely that calling off the relevance review actually *reduced* Reliance's fees.

34.    Although Kixsports, Carr, and Pye offer no other specific objections (such as to Reliance's hourly rates or individual line items), the Court has reviewed Reliance's invoices. The vast majority of charges appear to be consistent with the work that Reliance performed: imaging and searching seven electronic devices and then managing more than 100,000 documents retrieved from those devices. (*See* Computer Protocol Ex. 1; Sprinkle Aff. ¶ 14, ECF No. 139.) In addition, it appears that Reliance's work was hampered by resistance—including the refusal to provide login credentials—from Kixsports, Carr, and Pye before they retained their current counsel in July 2018. (*See* 2d Walton Aff. ¶ 28; 3d Walton Aff. ¶ 30; *see also* Reply Br. Ex. 1.) In view of these considerations, Reliance's charges for its forensic work appear to be fair and reasonable.

35.    There are, however, numerous charges related to Walton's preparation of affidavits in support of Defendants' motions. (*See* 3d Walton Aff. Ex. A; 2d Walton Aff. Ex. C.) These charges were not part of the forensic inspection, and the Court does not believe they are fairly included within the scope of Judge Lewis's order. Accordingly, the Court reduces the amount of Reliance's expert fees by $7,881.25. Kixsports, Carr, and Pye shall pay the remainder, $51,707.10, in compliance with Judge Lewis's order.

36.    Finally, the Court declines to hold Kixsports, Carr, and Pye in contempt for their failure to pay these invoices to date.  The record does not establish willful noncompliance with Judge Lewis's order, particularly given that the order does not specify an amount owed or a deadline for payment.  Under the terms of this Order, Kixsports, Carr, and Pye are jointly and severally liable for the amount to be paid to Reliance.  Should they fail to comply, their failure may be punishable by contempt in future proceedings.

## B. Sanctions

37.    Defendants also seek sanctions under Rule 37 and this Court's inherent authority.  Defendants ask the Court to strike the pleadings of Kixsports, Carr, and Pye and to enter a default judgment against them or, alternatively, to impose less severe sanctions.  (*See* Br. in Supp. 23, 25.)  Kixsports, Carr, and Pye oppose any sanctions largely on the ground that they complied with Judge Lewis's order.  (*See* Opp'n 19–20.)

38.    As this Court recently observed, Rule 37(b) "permits a court to order a variety of sanctions against a party who fails to obey a court order regarding discovery." *Red Valve, Inc. v. Titan Valve, Inc.*, 2019 NCBC LEXIS 57, at *40 (N.C. Super. Ct. Sept. 3, 2019).  In addition, "[t]rial courts retain the inherent authority 'to do all things that are reasonably necessary for the proper administration of justice.' " *Id.* at *39 (quoting *Beard v. N.C. State Bar*, 320 N.C. 126, 129, 357 S.E.2d 694, 696 (1987)).  Thus, trial courts have the inherent authority to impose sanctions on a party for bad-faith conduct and "for discovery abuses beyond those enumerated in Rule 37."

*Cloer v. Smith*, 132 N.C. App. 569, 573, 512 S.E.2d 779, 782 (1999); *see also Tumlin*, 2018 NCBC LEXIS 51, at *29 ("A court may impose discovery sanctions even absent an order pursuant to its inherent power to manage its own affairs." (alteration, citations, and quotation marks omitted)).

39. As noted, the evidence shows that Carr deleted one or more backup files related to his mobile device; that Carr and Pye altered their mobile devices' default settings so as to delete text messages over one year old; and that Pye selectively deleted text messages exchanged with Carr. Most alarming, though, is that Carr and Pye allowed the automated deletion of text messages to continue well *after* Judge Lewis ordered a forensic inspection. The deletion of evidence during the pendency of litigation and the continuing failure to preserve evidence in the face of a court order are sanctionable under Rule 37 and this Court's inherent authority.

40. Furthermore, it is now clear that Carr and Pye made false representations to Judge Lewis in an effort to convince him to deny Defendants' motion to compel. Both vowed that it would be "impossible" to comply with any order compelling the production of the requested communications because they had already turned over any e-mails, text messages, and other written communications that they had been able to locate. (*See* Pye Aff. ¶¶ 11, 12, 17; Carr Aff. ¶¶ 10, 11, 16.) Pye went so far as to testify that he was "not very proficient with technology" and therefore does not "send many emails or text messages." (Pye Aff. ¶ 11.) Yet Reliance retrieved more than *30,000* text messages from Pye's mobile devices. (2d Walton Aff. ¶ 24.) Pye also possessed enough technological savvy to delete the most important text messages—

those exchanged with Carr. And given the substantial number of relevant communications revealed by the forensic inspection, the only reasonable conclusion is that, contrary to their affidavits, Carr and Pye made inadequate efforts to locate responsive communications, failed to preserve them, or refused to produce them. Carr and Pye have never explained, corrected, or retracted their false, sworn statements.

41. These false representations are sanctionable under the Court's inherent authority, even if not sanctionable as a violation of Judge Lewis's order under Rule 37(b). The Court has a duty to protect the integrity of the legal process. That includes taking steps to address false statements made to the Court, both to ensure that the party making the false statement receives no advantage from it and to deter similar conduct by other parties in the future. *See, e.g.*, *First Bank v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 512 (6th Cir. 2002) (court's inherent authority "derives from its equitable power to control the litigants before it and to guarantee the integrity of the court and its proceedings"); *Goodvine v. Carr*, 761 Fed. App'x 598, 599, 602 (7th Cir. 2019) (affirming sanction of dismissal based on false affidavit); *Oliver v. Gramley*, 200 F.3d 465, 466 (7th Cir. 1999) (same).

42. The remaining question is what sanctions to impose. When choosing appropriate sanctions, trial courts have broad discretion. *See, e.g.*, *Feeassco, LLC v. The Steel Network, Inc.*, 826 S.E.2d 202, 210 (N.C. Ct. App. 2019). "The sanction imposed should be proportionate to the gravity of the offense." *Montano v. City of*

*Chicago*, 535 F.3d 558, 563 (7th Cir. 2008); *see also Few v. Hammack Enters., Inc.*, 132 N.C. App. 291, 299, 511 S.E.2d 665, 671 (1999).

43.     The Court concludes that it would not be appropriate to strike Kixsports, Carr, and Pye's pleadings. "Dismissals in general are viewed as the harshest of remedies in a civil case and should not be imposed lightly." *Page v. Mandel*, 154 N.C. App. 94, 100, 571 S.E.2d 635, 639 (2002). Moreover, our appellate courts have stressed that "the general purpose of the Rules [is] to encourage trial on the merits." *Batlle v. Sabates*, 198 N.C. App. 407, 419, 681 S.E.2d 788, 797 (2009) (citation and quotation marks omitted). Given the totality of the circumstances, the Court concludes that other, lesser sanctions are sufficient to address these abuses.

44.     First, at trial, the Court intends to advise the jury regarding Kixsports, Carr, and Pye's misconduct and to instruct the jury on spoliation of evidence. "The spoliation doctrine recognizes that where a party fails to produce certain evidence relevant to the litigation, the finder of fact may infer that the party destroyed the evidence because the evidence was harmful to its case." *Outlaw v. Johnson*, 190 N.C. App. 233, 244, 660 S.E.2d 550, 559 (2008); *see also Red Hill Hosiery Mill, Inc. v. Magnetek, Inc.*, 138 N.C. App. 70, 78, 530 S.E.2d 321, 328 (2000); *McLain*, 137 N.C. App. at 185, 527 S.E.2d at 717. In other words, the jury will be permitted, but not required, to draw an adverse inference from the evidence that Kixsports, Carr, and Pye either deleted or failed to preserve certain text messages and backup files for mobile devices. *See Arndt v. First Union Nat'l Bank*, 170 N.C. App. 518, 526–27, 613 S.E.2d 274, 280–81 (2005).

45. Second, some additional discovery is needed to ameliorate the loss of evidence. *See Zimmerman v. Poly Prep Country Day Sch.*, 2011 U.S. Dist. LEXIS 40704, at \*110–11 (E.D.N.Y. Apr. 13, 2011) (allowing additional deposition as sanction); *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 470 (S.D.N.Y. 2010) (identifying "further discovery" as potential sanction). Specifically, the Court will permit Defendants to depose Carr and Pye. Defendants deserve an opportunity to ask Carr and Pye, at a minimum, about the communications that have been disclosed, the communications that were deleted, their efforts to preserve evidence, and the statements made in their affidavits submitted in opposition to the motion to compel in March 2018.

46. Although Defendants have requested additional document discovery, the Court declines that request. Defendants could have sought a timely extension of the discovery period before it ended in March 2019. They did not, and when they later sought to reopen the discovery period after it expired, the Court denied the request due in part to their unexplained delay. (ECF No. 135.) Allowing additional document discovery now would unnecessarily delay resolution of this matter. Allowing Defendants to depose Carr and Pye, on the other hand, both serves to restore Defendants to the position they would have been in absent the destruction of electronically stored evidence and also allows the case to move forward without unreasonable delay.

47. Third, monetary sanctions are in order. Defendants have incurred substantial costs in pursuing this matter, necessitated by the false statements and

other improper resistance of Carr and Pye (and, by extension, Kixsports). Monetary sanctions are needed to compensate Defendants for their costs, including reasonable attorneys' fees, incurred in connection with filing this motion. *See, e.g., Pension Comm.*, 685 F. Supp. 2d at 471. To the extent Defendants seek additional costs of discovery, the request is denied.

## III.
## CONCLUSION

48. Accordingly, in the exercise of its discretion, the Court **GRANTS** the motion in part and **ORDERS** as follows:

a. Under the terms of Judge Lewis's order, Kixsports, Carr, and Pye shall bear the cost of the forensic examination performed by Reliance. Within 30 days of the entry of this Order, Kixsports, Carr, and Pye shall reimburse Defendants in the amount of $51,707.10.

b. The Court **DENIES** the request to hold Kixsports, Carr, and Pye in contempt.

c. The Court holds that Defendants shall be entitled to an adverse inference jury instruction, to be addressed at trial.

d. The Court further **ORDERS** that Defendants may depose Carr and Pye individually. These depositions, limited to seven hours each, shall take place within 14 days of the entry of this Order. Counsel shall work together to identify mutually agreeable dates and locations.

e. The Court **ORDERS** that Kixsports, Carr, and Pye shall pay the reasonable costs and fees incurred by Defendants in pursuing this motion. These

costs are set forth in "Group 5" of Exhibit 35 to the Supplemental Affidavit of A. Todd Sprinkle.  (ECF No. 149.1 at 14–18.)  Within fourteen days of this Order, Kixsports, Carr, and Pye may file their objections, if any, to the reasonableness of these costs.  This filing shall not exceed 1,500 words.  Defendants may respond to the objections no later than seven days after they are served with a similar word limit.  The Court invites the parties to stipulate to an appropriate amount and jointly submit that amount to the Court for its approval.

49.    Finally, the parties shall file all post-discovery dispositive motions on or before November 12, 2019.  Response and reply briefs shall be governed by Business Court Rule 7.8.


        **SO ORDERED**, this the 30th day of September, 2019.


                            /s/ Adam M. Conrad
                            Adam M. Conrad
                            Special Superior Court Judge
                             for Complex Business Cases